## Case No. 17,057.

WALDORF et al. v. The NEW YORK.

[1 Flip. 49; [1] 3 West. Law Month. 249.]

District Court, N. D. Ohio. 1862.

COLLISION—STEAMER AND SAIL—RULES OF NAVIGATION.

1. The navigation of sailing vessels, and those propelled by steam, applicable in cases of collision, is governed by this rule: The sailing vessel is to pursue her course; the duty of those managing the steam vessel being to so direct its course, or modify its speed, as to avoid a collision. It follows that a change of the sailing vessel, though made with the view of preventing a collision, is a mismanagement of the vessel.

2. But this rule is not so imperative as to forbid a change in the course of the sailing vessel, should it be manifest that a collision cannot otherwise be prevented, or that such change is made because the danger of such collision is imminent and impending. In such circumstances, whether such change in the course of the sailing vessel tended to an avoidance of the collision or not, is not of legal importance.

[This was a libel by Frederick Waldorf and others against the propeller New York (S. D. Caldwell, claimant) to recover for damages sustained in a collision.]

WILLSON, District Judge. This is a proceeding in rem in a cause of collision. The libellants were the owners of the schooner Dawn, a vessel of over two hundred tons burthen, which vessel was run into and immediately sunk, in Lake Erie, by the propeller New York, at about five o'clock in the morning of the 21st of October, 1859.

It is averred in the libel that the schooner was on a voyage from Buffalo to the port of Monroe, in the state of Michigan, with a cargo of salt and assorted merchandise. That during the voyage, between five and six o'clock in the morning of the 21st of October, 1859, the said schooner being then about twelve miles westerly of Port Stanley, in Canada, having a good northerly sailing breeze, and standing on a steady course of S. W. by W.,

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission.]

the first mate, who then had watch and was commanding officer of the deck, discovered the white light of a steam propeller approaching the vessel, and bearing about one point on her starboard bow; that at that time there were on the deck or the schooner, with the mate, two able-bodied seamen—one at the wheel, and one in the bow—on the lookout; that the attention of the mate was immediately called to the light of the propeller, which was thus first seen by the lookout on board of the vessel about ten minutes before the collision; that the schooner was kept steadily on her course of S. W. by W. until just before the collision, when the mate, being satisfied that the propeller would strike the schooner, and knowing that he could get to the windward of the propeller, ordered the vessel's helm to be put hard up, which order was promptly executed, and almost immediately thereafter the propeller struck the schooner in or near the main chains, cutting her to the water's edge, so that she immediately filled with water and sunk. It is further alleged in the amended libel that the schooner was tight, staunch, and well manned and provided, and that at the time of, and just before the collision, she had her starboard tacks aboard, going off large, with a white light burning brightly upon her pall bit, and that the sky was clear, with no fog or haze upon the water to obstruct the vision.

Stephen D. Caldwell, as claimant and sole owner of the propeller New York, has filed his answer, setting forth, among other things, that the said propeller, at the time of the casualty, was on her way from Toledo to Dunkirk, and was following the north shore of the lake on account of the wind, which blew fresh from the N. N. W.; that she was steering her course E. N. E., when about eight miles from the north shore, and some twelve miles to the westward of Port Stanley; that in that vicinity, and while steering the course last aforesaid, the second mate, who was the officer having command of the propeller, saw the light of the Dawn nearly ahead, but bearing to the larboard of the propeller's course; that as the schooner and propeller approached, in order to give her a good berth, the second mate ordered the wheelsman of the propeller to put the wheel aport, and the order was obeyed, which was some four minutes previous to the collision; that the schooner's light continued to bear to the larboard as the two vessels approached each other, and the second mate ordered the wheelsman the second time to put the wheel more aport, so as to give the schooner ample room to pass in safety, which order was obeyed. But after this second order was given, and the propeller was steering to pass to the starboard, the helm of the schooner was suddenly put to the starboard, which, unexpectedly to the officer in command of the propeller, brought the schooner directly across the course of the propeller, and as soon as this was discovered the officer of the propeller ordered the

wheel astarboard, and gave the proper signals for the stopping and backing of the engines in order, if possible, to prevent a collision, and the engineers commenced backing, but the distance between the two vessels was too short to enable the propeller to swing sufficiently to avoid the schooner or to stop; and the propeller, consequently, struck the schooner on the starboard side, abaft the main chains, and she sank in about twenty minutes; and that the disaster happened without any fault on the part of those having charge of the propeller, and solely by the improper conduct and fault of those in charge of the schooner.

Such are the detailed statements as to the movements of the two vessels placed on the record by the respective parties, and of the conduct of those in charge of them at the time of the collision. It accordingly becomes necessary to examine the proofs in the case, in order to trace the fault to the party really culpable, and on whom the loss should properly fall.

There are some leading facts disclosed by the evidence about which there can be no controversy. These are: that the wind was N. N. W. The course of the schooner, till a few moments before the collision, was S. W. by W., and the course of the propeller, E. N. E.

The speed of the schooner was five miles an hour, and that of the propeller about ten miles an hour. Those on watch upon their respective vessels discovered each other's white lights one point over their weather bows about fifteen minutes before the vessels came in contact. The schooner had her starboard tacks aboard, and exhibited a bright, white light upon her pall bit, and as her course was S. W. by W., with the wind abaft the beam, she was, in technical language, "going off large." The propeller struck the hull of the schooner in the main chains stem on, the two vessels making an angle of about thirty degrees at the point of contact.

It is conceded that these important facts were fully established by the proofs made upon the hearing of the cause. In order to ascertain the fault, if any there was, let us first examine the question with reference to the management and conduct of the Dawn.

As the wind was N. N. W., and the vessel's course was S. W. by W., she properly exhibited a white signal light, and that light was put in the proper place, to-wit: on the vessel's pall bit. That this light was good and sufficient, and burning brightly before and at the time of the disaster, is clearly proved by the testimony of the three men on the deck of the Dawn, and also by that of the second mate of the propeller, who was the commanding officer of her deck at the time, and who swears that he saw the Dawn's light fifteen minutes before the collision, and that "it was a bright, white light."

Nor is there any doubt about the vessel's being suitably officered and manned. John Varrer, the mate, was the officer of the deck at the time. His experience of thirteen years as a

sailor upon the lakes, and the intelligence and apparent candor with which he testified, satisfies us, not only that he was amply qualified for the duties of his post, but also that his statement of what occurred on the vessel contains a truthful narration of facts. The man at the wheel evidently understood and faithfully performed his duties. He swears that he has followed the waters since 1851, sailing from New York to Charleston, Savannah, and the West Indies, and on Long Island Sound and the lakes.

No exception is urged against the competency or fidelity of George R. Soules, who was on watch forward of the forerigging performing the service of a "lookout," as he promptly reported to the officer of the deck the propeller's light as soon as it was visible. Indeed, we are satisfied that no fault can be justly charged to the schooner, unless it be the change in her course, which was effected a few moments before the collision; and the question now is, whether that change of course was justified by the circumstances of the case, and from a just apprehension of impending danger.

When a steamer meets a sailing vessel, the general rule is, that the vessel, whether close hauled or with the wind free, has a right to keep her course, and it is the duty of the steamer to adopt such precautions as will avoid her. We see no objection to this rule, as applied in the case of St. John v. Paine, 10 How. [51 U. S.] 584, where it is said, that by an adherence to it on the part of the sailing vessel, the steamer, with a proper lookout, will be enabled, when approaching in opposite directions, to adopt the necessary measures to avoid the danger, as she will have a right to assume that the sailing vessel will keep her course, and that if the latter fails to do this, the fault will be attributable to her, and the master of the steamer will be held responsible only for a fair exertion of the power of his vessel to avoid the collision under the unexpected change of the course of the sailing vessel, and the circumstances of the case.

But to this general rule (as thus explained), there are exceptional cases. When, for instance, the rule cannot be followed without defeating the end for which it is established, or without producing the mischief it is designed to avert, it will have no application; and in such a case a departure from it would be both justifiable and commendable. Hence, when a sailing vessel is approaching a steamer coming from an opposite direction, and from their proximity to each other the danger of collision becomes imminent and impending, the vessel's course may be changed in any manner which, in the opinion of those navigating her, will lessen the hazards of the disaster. And in such a case, whatever may be the error of judgment on the part of those in charge of the sailing vessel, the steamer will, nevertheless, be held responsible for the consequences of the collision; and for the obvious reason that those who produced the peril and put the vessel in jeopardy should be chargeable with the fault, and respond in damages.

What, then, were the facts and circumstances attending the change of course of the Dawn? The mate of the schooner, who at the time was officer of the deck, and who gives an account of what occurred on board, from the first appearance of the propeller's light to the time of collision, says, that when the man on the lookout forward reported a light ahead one point over the weather bow, he (the mate) looked and found it to be a white light in the direction reported. He then went aft, examined the compass, and found the vessel on her regular course—S. W. by W. He told the wheelsman to keep her so. He then went forward, and paced the deck a half dozen times, watching the approaching light, which continued its bearing to the windward. The man forward then said it was a propeller. He went aft and again looked at the propeller, and became convinced his vessel was in danger of being run into. He promptly ordered the wheelsman to put the helm hard up and keep her away. The wheelsman not being able to execute the order speedily, the mate went to his assistance, and immediately thereafter ran forward, shook the cabin door as he passed, to wake up the captain, and jumped, as quick as possible, about ten feet forward of the main rigging, and at that moment the propeller struck the vessel in the main chains, stem on.

And he says not more than a minute of time elapsed before the collision, after he ascertained that the approaching vessel was a propeller, and that if the schooner had kept her course the propeller would have struck the schooner somewhere in the forerigging, as the propeller, when the vessel's helm was put hard up, was not further distant than twice her length.

This sworn statement of the mate is substantially corroborated by the testimony of the wheelsman, and also by that of the watchman, who was acting as a lookout. Nor can we see anything in the testimony of the commanding officer of the propeller which contradicts or tends to weaken this testimony of the men on the schooner. He swears that while in the pilot house, after he had given the two orders to port the propeller's wheel (the last of which orders was given about one minute before the collision), he kept looking at the schooner, and he then first saw her swinging to the southward. He reached back, rang the stopping bell, ordered the wheelsman to starboard the helm, ran to the top of the pilot house (a distance of forty feet), and before he got there the collision took place.

These are the leading circumstances as disclosed by the testimony upon which to determine the propriety of the order given to change the vessel's course to the southward. None of the witnesses are able to give the exact heading of either vessel at the time they came in contact. The execution of the last order on the propeller had simply the effect of checking her swing to the starboard. The mate does not

think it had the effect of bringing the bow of the propeller to port before she struck. And he says when the order to starboard was given a collision was inevitable.

From a careful examination of all the evidence in the case we are satisfied that the schooner Dawn committed no fault; and that the order to port, by the execution of which she began to swing to the southward, was given under such circumstances as to be justified by the impending danger of collision, and by those prudential considerations which always characterize good seamanship.

The next inquiry is, whether this collision was a casualty for which no blame should be imputed to either party, or did it result from the carelessness and improvidence of those in charge of the propeller?

In the case of The Oregon v. Rocca, 18 How. [59 U. S.] 570, it was held, that when a steamer approaches a sailing vessel, the steamer is required to exercise the necessary precautions to avoid a collision; and if this be not done prima facie, the steamer is chargeable with fault. This is substantially the same rule as the one laid down by the court in St. John v. Paine [supra]. It was again affirmed in the case of The Genessee Chief, 12 How. [53 U. S.] 461. And yet again, in the case of The Pacific v. Rumball, 21 How. [62 U. S.] 372.

The rule is made thus stringent upon steamers, because they possess a power to avoid a collision not belonging to sailing vessels, even with a free wind, the master having the steamer under his command, both by altering the helm and stopping the engines. Hence, greater caution and vigilance are to be exacted from those in charge of them to avoid the dangers of navigation. This (said Mr. Justice Nelson) justly results from the superior power to direct and control the course and speed of the vessel, and the serious damages consequent upon a failure to avoid the dangers.

Many of the allegations contained in the claimant's answer, in this case, are fully sustained by the proofs. Those allegations we pass over without any comment upon the evidence which supports them. It will only be necessary to refer in detail, to the testimony of the second mate of the propeller, to ascertain the true cause of the collision.

He was the commanding officer of the propeller at the time of the disaster. He says, that while in the pilot-house watching for lights, he saw the bright white light of the Dawn fifteen minutes before the collision, and it bore less than a point over the propeller's bow. He looked at the compass and found his vessel steering a quarter of a point northerly of her true course. She was then brought to her regular course of E. N. E., and kept upon it ten minutes. At the end of the ten minutes, the Dawn's light bore one point over his port bow. He then gave the order to port, and in a quarter of a minute she was steadied on a course of E. by N. and kept upon it two minutes, and the order was given to port more. This, he says, was about a minute before the collision, and up to this time the speed of the propeller had not been checked. He at once saw that a collision was inevitable; hastened to the top of the pilot house, and before he could get there the vessels collided.

This coming in such close proximity to the schooner, without any abatement of the propeller's speed, was the result of recklessness or ignorance, or of both combined. That the second mate was totally incompetent to have command of the propeller, is perfectly apparent by a reference to his own testimony.

To the question, as to "what course a sailing vessel could steer with a green light, the wind being N. N. W.," his reply is: "Cannot tell, exactly; she could sail S. E. by E. Can't tell whether she could steer any other course or not." And to the question, "What course could a sail vessel steer and carry a red light, the wind being N. N. W.," he reveals his ignorance in the reply, and bluntly says—"The fact is, I cannot tell." He further says, on cross-examination, that if he had been approaching a red light, when and where he saw the white light of the Dawn, he should have concluded the schooner was going across the lake, and he would have put the vessel astarboard; and he gives it as his opinion, as an expert, that such a light would not, if the wind was N. N. W., entitle a sail vessel to steer west. He finally reveals the true cause of the disaster, when he swears, that he had no idea that the course of the Dawn crossed that of the propeller, and that if he had supposed the lines of progress of the two vessels crossed each other, he would not have done as he did.

Now, the most ignorant deck hand on the propeller ought to have known, that if the wind was N. N. W., the white light of the Dawn indicated her course southerly of the point W. S. W., and that the courses of the two vessels must necessarily cross each other. The exhibition of the vessel's white light told as plainly as could the compass in the schooner's binnacle.

The ignorance and unskillfulness on the part of the officer in charge of the propeller, and his incapacity to understand and perform the most important duties of his post, beyond question, brought about the collision. This view of the case renders it unnecessary for us to examine and pass upon several other points brought to our attention, and ably argued by the learned counsel on both sides.

We are clearly of the opinion that the propeller was in fault, and that, consequently, she must be held liable for the damages sustained by the owners of the schooner. It only remains to consider the question of damages.

The schooner Dawn was built at Milan, in the winter of 1846–7, and was put into commission in May, 1847. She was constructed under the immediate supervision of James P. Gay, and at a cost of $9,500.

Gay testifies that the materials used in the workmanship upon her, generally, were superior to those of other vessels of her class. That a considerable amount of money was expended in salting; and also in protecting her upper

works by means of oil and white lead. He says every precaution was taken in her construction necessary to prolong her life, and for this purpose one thousand dollars more were expended than is ordinarily bestowed on vessels of her class.

He overhauled and examined her when she was seven years old, and found her hull and masts sound. He again examined her hull about three years since, and he says he found it entirely sound, and the vessel itself in better condition than many of those of half her age. In his opinion, her value in 1859 was from $2,500 to $3,000.

In 1855, the Dawn sprung a leak in a gale and was sunk off Long Point, in Lake Erie. In about a week afterwards, she was pumped out, towed to Buffalo, and put on the dry dock for repairs. By the accident, the vessel's beams were raised off the clamps at one end, the centre box started, and some damage done to the plankshire.

Vincent Bidwell testifies that he carefully examined her hull while on the dry dock, and found no decay in her timbers, and that after the repairs were made, the vessel was in as good condition as before the accident. Charles A. Gardner, marine inspector for the board of underwriters, examined the Dawn in 1858, for the purpose of knowing what rate to charge for insurance on her hull. He reported her then value to be $3,000. But his valuation was reduced by the board, and put on the books of the association at $2,500, for the year 1859.

A large amount of testimony has been taken in this case, showing a general depreciation in the market value of vessel property since 1855, and also the ordinary depreciation from age and wear. Mr. Bidwell puts this general depreciation, from 1855 to 1859, at 35 per cent. And many of the witnesses estimate the annual depreciation from ordinary wear and age, to be about ten per cent.

Though the testimony, as to the value of the Dawn, in 1859, is conflicting, yet from a careful examination of all the evidence on this branch of the case, giving due weight to the testimony of those witnesses who have the best means of knowledge, we have come to the conclusion that her value, at the time of the collision, was $2,400. A decree will accordingly be entered in favor of the libellants for that amount.